**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Modus LLC, | No. CV-12-00699-PHX-JAT |
| Plaintiff/Counter-Defendant/Third-Party Defendant, | **ORDER** |
| v. | |
| Encore Legal Solutions, Inc., d/b/a Encore Discovery Solutions, | |
| Defendant/Counter-Plaintiff. | |
| and | |
| Epiq Systems, Inc., | |
| Third-Party Plaintiff | |

Pending before the Court is Plaintiff's Motion to Dismiss Second Amended Counterclaim and Third-Party Complaint (Doc. 69). The Court now rules on the motion.

**I.   Background**

This dispute arises from Plaintiff Modus LLC's ("Modus") hiring of former employees of Defendant Encore Legal Solutions, Inc. ("Encore"). Encore, which is wholly owned by Epiq Systems, Inc. ("Epiq"), alleges it directly competes with Modus in the electronic discovery industry. (Doc. 68 at 9, 15). The employees at issue, Curtis Craghead, Michael Malone, Cean Siegel, and Michael Lindsey (collectively, the "Employees") were employed by Encore and each signed an employment agreement (the "Employment Agreement"). (Doc. 68 at 10-11). The Employment Agreement contained

several restrictive covenants, including a confidentiality provision and a non-compete provision (the "Non-Compete Agreement"):

> **CONFIDENTIAL EPIQ INFORMATION.** I agree at all times during the term of my employment and thereafter, to hold in strictest confidence, and not to use or disclose to any person, firm or corporation, except for the direct benefit of Epiq Systems, Inc. and its subsidiaries and affiliates (collectively, "Epiq"), without written authorization of the Board of Directors of Epiq Systems, Inc., any Confidential Information of Epiq or of any of its customers. I understand that "Confidential Information" means any information of Epiq, its vendors or its customers including but not limited to any proprietary information, technical data, trade secrets or know-how, information relating to research, product plans, products, services, customer lists, customers, markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration, marketing or finances, or other business information in any form including but not limited to electronic, oral, visual, or hard copy. I further understand that Confidential Information does not include any of the foregoing information or items that are publicly known and generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item(s) or information involved.
>
> * * *
>
> **NON-COMPETITION.** . . . I agree that for a period of six (6) months immediately following the termination of my employment with the Company for any reason, I will not participate in, provide, promote, associate my name with, supervise, finance or manage (as an employee, consultant, contractor, officer, owner, director, or otherwise) any activities or services on behalf of a Competitor that are the same or similar in function or purpose to those I performed, managed, or promoted for the Company in the two (2) year period preceding the termination of my employment (or such lesser time as I was employed). This restriction will only apply in the Restricted Area. . . . As used herein, a "Competitor" is any person or entity that provides a product and/or service that would displace or compete with a Company product or service that I was involved in or was provided Confidential Information about in the course of my employment and that the Company continues to provide as part of its business while this contract applies. The "Restricted Area" is the territories where I performed services for the Company. . . .

(Doc. 71-1 at 34).

Each of the Employees resigned from Encore and subsequently was hired by

Modus. (Doc. 68 at 16-17). After Encore confronted Modus about hiring the Employees in alleged violation of the Employment Agreement, Modus brought this action for a declaratory judgment. (Doc. 1 at 6-8). Encore (along with Epiq as a third-party plaintiff) counterclaimed for tortious interference with contractual relations and violation of the Arizona Trade Secrets Act, and sought injunctive relief. (Doc. 16); (Doc. 68 at 22-26). The Court stayed the proceedings pending arbitration between Encore and the Employees. (Doc. 56). Following the lifting of the stay (Doc. 65) and the filing of the Second Amended Answer, Counterclaim and Third-Party Complaint (Doc. 68), Modus filed this motion to dismiss. (Doc. 69).

## II.    Rule 12(b)(6) Standard

A complaint may be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted if it fails to state a cognizable legal theory or fails to allege sufficient facts under a cognizable legal theory. *Balistreri v. Pac. Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). To survive a motion to dismiss, a complaint need contain only "a short and plain statement of the claim showing that the pleader is entitled to relief" such that the defendant is given "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed.R.Civ.P. 8(a)(2) and *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

But although a complaint "does not need detailed factual allegations," a plaintiff must "raise a right to relief above the speculative level." *Id.* This requires more than merely "a formulaic recitation of the elements of a cause of action." *Id.* A complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Facial plausibility requires the plaintiff to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

In reviewing a complaint for failure to state a claim, the Court must "accept as true all well-pleaded allegations of material fact, and construe them in the light most favorable to the non-moving party." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). However, the Court does not have to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Id.*

### III. Tortious Interference with Contractual Relations

Modus argues that Encore's claim for tortious interference with contractual relations fails as a matter of law because inducing an at-will employee to leave his or her employer does not by itself give rise to a valid claim, the Non-Compete Agreement is facially unenforceable, and Encore fails to allege a plausible claim for damages. (Doc. 69 at 3, 4, 8).

#### A. Legal Standard

Under Arizona law, a "prima facie case of intentional interference requires: (1) existence of a valid contractual relationship, (2) knowledge of the relationship on the part of the interferor, (3) intentional interference inducing or causing a breach, (4) resultant damage to the party whose relationship has been disrupted, and (5) that the defendant acted improperly." *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12, 31 ¶ 74 (Ariz. 2002). A non-compete agreement may serve as the predicate contract for an action against an employer who induces an employee to violate the terms of the agreement, *see Mattison v. Johnston*, 730 P.2d 286, 291 (Ariz. Ct. App. 1986), but only if the agreement is enforceable.

Although the determination of whether a non-compete agreement is enforceable is a "fact-intensive inquiry that depends on weighing the totality of the circumstances," it is ultimately a question of law. *Valley Med. Specialists v. Farber*, 982 P.2d 1277, 1280-81 ¶ 11 (Ariz. 1999). "[A] covenant not to compete is invalid unless it protects some legitimate interest beyond the employer's desire to protect itself from competition." *Id.* at 1281 ¶ 12. "A restriction is unreasonable and thus will not be enforced: (1) if the restraint is greater than necessary to protect the employer's legitimate interest; or (2) if that

1 interest is outweighed by the hardship to the employee and the likely injury to the
2 public." *Id.* at 1283 ¶ 20. A restraint's "scope is defined by its duration and geographic
3 area," and the restraint "must be limited to the particular specialty of the present
4 employment." *Id.* at 1284 ¶ 25, 1285 ¶ 27.

5 An employer has a legitimate interest in "preventing competitive use, for a time,
6 of information or relationships which pertain particularly to the employer and which the
7 employee acquired in the course of the employment . . . [and] in having a reasonable
8 amount of time to overcome the former employee's loss, usually by hiring a replacement
9 and giving that replacement time to establish a working relationship." *Bed Mart, Inc. v.*
10 *Kelley*, 45 P.3d 1219, 1221-22 ¶ 12 (Ariz. Ct. App. 2002) (quoting *Farber*, 982 P.2d at
11 1281 ¶ 12, 1284 ¶ 25) (internal quotation marks omitted). The employer bears the burden
12 of proving its interest. *Bryceland v. Northey*, 772 P.2d 36, 39 (Ariz. Ct. App. 1989).

13 If a provision in a non-compete agreement is unenforceable but it is clear from the
14 agreement that the provision was intended to be severable, a court may strike out only
15 that provision, letting the balance of the agreement stand. *Farber*, 982 P.2d at 1285-86 ¶
16 30. ("Arizona courts will 'blue pencil' restrictive covenants, eliminating grammatically
17 severable, unreasonable provisions."). However, a court cannot rewrite the parties'
18 agreement "in an attempt to make it enforceable." *Id.*

19 **B.  Analysis**

20 Encore first argues that the enforceability of a non-compete agreement may not be
21 determined on a motion to dismiss. (Doc. 72 at 12). Although Encore is correct that this
22 is a fact-intensive inquiry, *see Farber*, 982 P.2d at 1280-81 ¶ 11, it is ultimately a
23 question of law and courts in this district have, when appropriate, made this
24 determination prior to the start of discovery. *See Unisource Worldwide, Inc. v. Swope*,
25 ___ F. Supp. 2d ___, 2013 WL 4029170, at *11 (D. Ariz. 2013) ("That the inquiry is
26 usually fact-based does not, however, automatically preclude the possibility of a covenant
27 being unreasonable on its face."). Although *Swope* involved a judgment on the pleadings,
28 the standard for a motion to dismiss is the same. *See Dworkin v. Hustler Magazine, Inc.*,

1  867 F.2d 1188, 1192 (9th Cir. 1989) (noting Rule 12(b) and 12(c) motions are functionally identical).

Modus argues that the Non-Compete Agreement is facially unenforceable because its scope is broader than is necessary to protect Encore's legitimate interests. (Doc. 69 at 5-6). In evaluating this argument, the Court considers the Non-Compete Agreement along with any factual allegations in the counterclaim and third-party complaint, which it assumes as true. Aside from an allegation that the Employees had access to "confidential client contact information," (Doc. 68 at 13), Encore does not allege any facts concerning the nature or scope of Encore's interests allegedly protected by the Non-Compete Agreement. Encore alleges only a breach due to Modus's tortious interference.[1] (*Id.* at 18, 22).

The Court finds the Non-Compete Agreement to be facially unenforceable because its restrictions are not limited to protecting Encore's confidential information or relationships. The agreement prohibits the Employees from working, for six months after termination of employment with Encore, for any company that competes with Encore in a product or service in which the Employees were involved or provided confidential information. *See* (Doc. 71-1 at 34). But a former employer does not have a legitimate interest in being protected from fair competition. *See Farber*, 982 P.2d at 1281 ¶ 12. In *Swope*, a similar non-compete provision was facially unenforceable:

> Employee will not compete, directly or indirectly, with the Business of Unisource by performing activities of the type performed by Employee for the Company within one year prior to Employee's termination of employment. This paragraph restricts competition only within the counties in which Employee solicited business on behalf of the Company during the 12 months preceding the cessation of Employee's employment with the Company.

___ F. Supp. 2d at ___, 2013 WL 4029170, at *9. That employment agreement, like the one at issue, also contained provisions regarding confidentiality, assignment of

---

[1] Encore concedes in its response that its claim for tortious interference is not predicated upon the mere hiring of the Employees but only upon Modus' hiring with the knowledge that it would violate the Employment Agreement. (Doc. 72 at 11).

inventions, and non-solicitation. *Id.* at ___, 2013 WL 4029170, at *12. In *Swope*, the presence of these other provisions overcame the former employer's attempt to establish its legitimate, protectable interest in the non-compete provision. Because the confidentiality and non-solicitation provisions separately protected the former employer's interests in those areas, the Court concluded the former employer failed to establish an independent justification for the non-compete provision. *Id.* at ___, 2013 WL 4029170, at *12 ("Having carved out and secured each protectable interest with a separate covenant, Plaintiff cannot then demand that Defendants abide by an 'umbrella covenant' that functions only to undermine fair competition and hurt Defendants' ability to work.").

Here, the Employment Agreement included a confidentiality provision, a provision for returning Encore's property upon termination of employment, and non-solicitation provisions covering Encore's customers, referral sources, and current employees. (Doc. 71-1 at 34). These provisions protect Encore's trade secrets, confidential information, and customer relationships. Although Encore asserts that the Non-Compete Agreement is required to protect it from "competitive use of information pertaining to Encore and acquired by the Employees in the course of their employment," (Doc. 72 at 13), in light of the Employment Agreement's separate protection of confidential and customer information, Encore fails to establish that the Non-Compete Agreement protects a legitimate interest.[2] These provisions render unreasonable the restriction upon the Employees' post-Encore employment.

The Court cannot "blue pencil" the Non-Compete Agreement to salvage its reasonableness because this would require striking the core of the agreement and replacing it with more restrictive terms limiting its scope to the use of confidential information or customer relationships, which the Court may not do. *See Farber*, 982 P.2d

---

[2] Encore correctly points out that Modus' hypothetical attacks upon the Non-Compete Agreement's applicability to janitorial and secretarial employees are not at issue here, and the Court has not considered them. (Doc. 72 at 14 n.6). However, Encore's citation to *Roanoke Engineering Sales Co. v. Rosenbaum*, 290 S.E.2d 882 (Va. 1982) is unpersuasive. *Roanoke* applied Virginia law and, peculiarly, involved a non-compete agreement among the four shareowners of a closely held corporation. 290 S.E.2d at 883.

1    at 1285-86 ¶ 30. The Non-Compete Agreement is facially unenforceable. Accordingly,
2    there was no valid contractual relationship with which Modus could tortuously interfere,
3    and Encore has not established its claim for tortious interference with contractual
4    relations.[3] *See Wells Fargo Bank*, 38 P.3d at 31 ¶ 74.

**IV.     Misappropriation of Trade Secrets**

Modus alleges Encore has not established a plausible claim that Encore had protectable trade secrets, that Modus misappropriated those trade secrets, and that the misappropriation caused damages to Encore. (Doc. 69 at 10, 16, 17).

**A.     Alleged Facts**

Encore's counterclaim alleges the following facts in support of its claim for misappropriation, which the Court takes as true for purposes of deciding the motion to dismiss. While employed by Encore, the Employees had access to Encore's "confidential and proprietary" library of programming scripts "that were developed and modified by Encore to facilitate an Encore-designed user interface between third party software tools and Encore's clients." (Doc. 68 at 13-14). These scripts included "Encore's entire Relativity® script library—a library that includes more than 11,000 individual scripts and script kits; and . . . Encore's library consisting of approximately 30,000 unique scripts, including scripts related to the use of Concordance®." (*Id.* at 14). These scripts were developed "at substantial cost to Encore and, in some cases, over long periods of time." (*Id.*). Encore stored the scripts on a password-protected server and restricted access to only those employees whose job duties required using them. (*Id.* at 14-15).

Shortly before Malone, Craghead, and Lindsey left Encore's employment, each of them inserted a USB portable storage device into his computer and accessed Encore's proprietary information. (*Id.* at 16-17). Malone copied "Encore's entire Relativity® script

---

[3] As a result of this holding, the Court need not address Modus' arguments concerning ambiguities in the geographic scope of the Non-Compete Agreement, (Doc. 69 at 6), and Encore's general reliance upon *Mattison* (*id.* at 12) is unhelpful because that case involved the scope of a non-compete provision. *See Mattison*, 730 P.2d at 292 (concluding ambiguous terms as to the *scope* of a non-compete provision created a question of fact). Furthermore, the Court also need not reach Modus' argument whether Encore alleges a plausible claim for damages. (Doc. 69 at 8).

library, which includes more than 11,000 individual scripts and script kits" as well as "the entire .sql library saved on his Encore laptop." (*Id.* at 16). Craghead copied "Encore's library consisting of approximately 30,000 unique scripts, including scripts related to the use of Concordance®." (*Id.*) Encore believes Craghead and Lindsey still possess the USB devices containing Encore's proprietary and trade secret information. (*Id.*)

Upon beginning employment with Modus, Malone copied Encore's "entire Relativity® script library" onto Modus's laptop computer and "thereafter utilized information contained in Encore's trade secret script library to fashion scripts for use by [Modus] and/or its employees." (*Id.* at 19). Malone shared this information with Modus and a January 22, 2013 forensic examination of Malone's Modus-issued laptop found Encore's script library stored on the laptop despite Malone's earlier affirmation that he no longer possessed Encore's scripts. (*Id.*)

A January 23, 2013 forensic examination of Craghead's Modus-issued laptop found Encore's script library stored on the laptop despite Craghead's earlier affirmation that he no longer possessed Encore's scripts. (*Id.* at 21). Encore believes both Malone and Craghead continue to use Encore's trade secret scripts "in the course and scope of employment" with Modus and for Modus' benefit. (*Id.* at 22).

### B. Legal Standard

Arizona has adopted the Uniform Trade Secrets Act, which "codifies the basic principles of common-law trade-secret protection." *Enter. Leasing Co. of Phoenix v. Ehmke*, 3 P.3d 1064, 1068 ¶ 12 (Ariz. Ct. App. 1999). A trade secret is:

> information, including a formula, pattern, compilation, program, device, method, technique or process, that both:
>
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

A.R.S. § 44-401(4). In an action for misappropriation, the plaintiff "must identify the trade secrets and carry the burden of showing that they exist." *MAI Sys. Corp. v. Peak*

1  *Computer, Inc.*, 991 F.2d 511, 522 (9th Cir. 1993); *see also Calisi v. Unified Fin. Servs., LLC*, 302 P.3d 628, 631 ¶ 14 (Ariz. Ct. App. 2013). The plaintiff "should describe the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade." *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164-65 (9th Cir. 1998). It is insufficient to claim that software merely "contain[s] valuable trade secrets" without specifically identifying those secrets, *MAI*, 991 F.2d at 522, or that a system's characteristics generally are trade secrets without clearly referring to the precise characteristics, *Imax*, 152 F.3d at 1167.

The "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" constitutes misappropriation. A.R.S. § 44-401(2)(a). "'Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy or espionage through electronic or other means." *Id.* § 44-401(1). Misappropriation also occurs, in relevant part, when a person discloses or uses "a trade secret of another without express or implied consent" and "[a]t the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret . . . was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." *Id.* § 44-401(2)(b).

Misappropriation of a trade secret gives rise to a claim for damages or injunctive relief. A.R.S. §§ 44-402(A), -403(A).

**C. Analysis**

Modus' first contention is that Encore fails to establish the existence of its trade secrets because its claim does not identify a specific trade secret but merely asserts that its scripts library, consisting of tens of thousands of scripts, contains trade secrets. (Doc. 69 at 11, 14); (Doc. 75 at 2). Modus primarily relies upon *Imax* and *MAI* as requiring Encore to identify the specific trade secrets contained within its scripts. (*Id.* at 13-14).

In *Imax*, one of the claimed trade secrets was "the design of the cam unit, *including every dimension and tolerance that defines or reflects that design*." 152 F.3d at

- 10 -

1166. The Ninth Circuit held that the plaintiff had not "achieved the level of specificity necessary to identify the numerical dimensions and tolerances as trade secrets." *Id.* at 1167 ("[B]ecause Imax's trade secrets claim involves a sophisticated and highly complex projector system, it is unlikely that the district court or any trier of fact would have expertise in discerning exactly which of the projector system's many 'dimensions and tolerances' were trade secrets."). Similarly, in *MAI*, the bare assertion that "the diagnostic software 'contain[s] valuable trade secrets of MAI'" was insufficient to specifically identify the alleged trade secrets. 991 F.2d at 522-23.

But unlike the claims in *Imax* and *MAI*, Encore's claim alleges the particular subject matter of its trade secrets: "provid[ing] a unique, user friendly and web-accessible interface (a web portal) between Encore's clients and certain third party e-discovery software programs." (Doc. 68 at 14). Encore is required only to describe "the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade." *Imax*, 152 F.3d 1161, 1164-65. Moreover, unlike *Imax* and *MAI*, which involved summary judgment rulings upon the merits of misappropriation claims, at the pleading stage Encore merely must state a claim for relief "that is plausible on its face." *Twombly*, 550 U.S. at 570. It is plausible that the content of Encore's scripts is not general knowledge to anyone in the e-discovery industry nor is it special knowledge to anyone skilled at writing similar scripts.

Modus cites *Perryman v. Dorman*, 2011 WL 379313 (D. Ariz. Feb. 2, 2011), which held that alleging that documents contained confidential information constituting trade secrets was insufficient to state a claim for misappropriation because it did not "specify what information is not generally known to the public" or whether reasonable steps had been taken to maintain secrecy, 2011 WL 379313, at *6, and *Scottsdale Ins. Co. v. Cook*, 2010 WL 4942764 (D. Ariz. Nov. 24, 2010), which held that conclusory allegations of "a large number of documents" consisting of financial and customer data were inadequate to state a claim because they were "not sufficient to explain why the

1  information constitutes trade secrets, or how exactly it derives its independent economic
2  value from not being generally known," 2010 WL 4942764, at *3. (Doc. 69 at 12); (Doc.
3  75 at 3). But Encore's scripts are unlike the documents in those cases because Encore has
4  pleaded that its scripts are self-created or self-modified software programs utilized in the
5  provision of its business services—a step beyond vague allegations of "documents"
6  containing trade secrets.[4]

7  Therefore, Encore has established the plausible existence of trade secrets in its
8  script libraries.[5] In its response, Modus asks the Court to nevertheless order Encore to
9  "identify and describe its trade secrets with reasonable particularity as a precondition to
10 discovery." (Doc. 69 at 16). But the supporting cases Modus cites involved objections to
11 discovery requests, not motions to dismiss. *See Switch Commc'ns Grp. v. Ballard*, 2012
12 WL 2342929, at *5 (D. Nev. June 19, 2012); *DeRubeis v. Witten Techs., Inc.*, 244 F.R.D.
13 676, 680 (N.D. Ga. 2007). The Court denies Modus' request as premature.

14 Modus next contends that Encore has not established misappropriation because
15 Encore does not plead that Lindsey, Siegel, and Troff (another former Encore employee
16 hired by Modus) disclosed or used any of Encore's trade secrets. (Doc. 69 at 16). But
17 Encore alleged that Malone and Craghead copied Encore's script library, stored it on their
18 Modus-supplied computers, and used it for the benefit of Modus, (Doc. 68 at 19, 21-22),
19 and Encore's claim is against Modus, not the Employees in their individual capacity. For
20 purposes of deciding the present motion, these facts support a claim of misappropriation
21 by Modus regardless of the alleged inaction of Lindsey, Siegel, and Troff.

22 Finally, Modus argues that Encore fails to allege a plausible claim for

---

[4] Similarly, the other case upon which Modus relies is distinguishable. *See FormFactor, Inc. v. Micro-Probe, Inc.*, 2012 WL 2061520, at *6 (N.D. Cal. June 7, 2012) (on motion for summary judgment, list of computer files was not specific because it failed to "clearly identify what each individual thing is that is alleged to be a trade secret"). Per Ninth Circuit Rule 36-3, the Court does not consider Modus' citation to *Native American Services, Inc. v. Givens*, 213 F.3d 642 (9th Cir. 2000) (unpublished decision).

[5] Encore's claim may not survive summary judgment, however, absent further development.

- 12 -

proximately-caused misappropriation damages. (Doc. 69 at 17). Encore alleged that it and Epiq have "sustained and will continue to sustain actual and/or consequential damages in an amount to be determined at trial." (Doc. 68 at 25). Along with Encore's allegations that its scripts were developed at "substantial cost" and provide a "unique" interface to its customers, (*id.* at 14), this is sufficient to state a plausible claim for damages. The Court finds Encore has pleaded a plausible claim of trade secret misappropriation.

## V. Conclusion

For the foregoing reasons,

**IT IS ORDERED** granting in part and denying in part Plaintiff's Motion to Dismiss Second Amended Counterclaim and Third-Party Complaint (Doc. 69). The motion is granted as to Encore and Epiq's claim for tortious interference with contractual relations. The motion is denied as to Encore and Epiq's claim for trade secret misappropriation.

**IT IS FURTHER ORDERED** dismissing Encore and Epiq's claim for injunctive relief to the extent such claim is based upon the claim for tortious interference with contractual relations.

Dated this 17th day of December, 2013.

James A. Teilborg
Senior United States District Judge